UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————————————————

|
|
ROCHESTER MIDLAND CORPORATION,          |     Case No. 1:08-cv98
|
      Plaintiff,                     |     HONORABLE PAUL MALONEY
|
           v.                       |
|
ENERCO CORPORATION, a Michigan corporation,  |
and DOUGLAS VANDENBURG, an individual,      |
|
      Defendants.                  |
|

———————————————————————————

## ORDER AND OPINION

**Denying Vandenberg's Motion for Summary Judgment on Breach of Contract Claim;
Denying Enerco's Motion for Summary Judgment on Tortious-Interference Claim**

Starting in 1985, Defendant Douglas Vandenburg worked as a sales representative for the Schaefer company for about nineteen years, apparently performing well and earning the regard of his employer and many of his customers. Plaintiff Rochester Midland Corporation ("RMC") bought Schaefer in September 2004 and became Vandenberg's employer. At that time, RMC required Vandenberg to sign a contract which imposed several potentially relevant duties: a duty of loyalty while working for RMC, and duties of non-solicitation and non-disclosure for one year after leaving their employ. Significantly, the contract prohibited not only directly soliciting his former RMC customers or accepting business from them, but also indirectly helping another party to solicit such customers or accept business from them.

Vandenberg discussed employment with defendant Enerco Corporation ("Enerco") in

December 2005 but rejected their offer in January 2006.  Shortly after RMC gave Vandenberg a mixed evaluation and placed him on a performance improvement plan in February 2007, however, he contacted Enerco and asked if the offer was still open.

Vandenberg signed a contract with Enerco, gave RMC two weeks notice in June 2007, and began working for Enerco on July 9, 2007.  It is undisputed that Enerco officers and/or supervisors – such as president Othmer and sales manager JoAnn Cranson – spoke with a number of Vandenberg's former RMC customers in the days immediately after he went from RMC to Enerco. Enerco insists that it did not initiate contact with those customers, while RMC seems to suspect and suggest otherwise.  It is also undisputed that at least ten of RMC's customers who had been served by Vandenberg – including four of its largest customers, e.g., the Kalamazoo Public Schools – moved business from RMC to Enerco during the first year after he went to Enerco, costing Enerco a substantial amount of revenue.  Finally, Vandenberg admits that for more than one year after leaving RMC's employ, he had in his possession documents (both paper and computer files) containing confidential customer, product, and pricing information which the contract required him to return immediately upon leaving.  He denies, however, that he made any use of that confidential information or that he conveyed it to Enerco.

RMC asserts two claims under Michigan common law.  In count one, RMC claims that Vandenberg breached those contractual duties by (1) recommending that a customer continue to use an Enerco product, at least until its existing paid-for supply ran out, rather than investigating whether the RMC product might be appropriate instead; (2) wrongfully keeping confidential RMC product, pricing, and customer information, for more than a year after he started working for Enerco, that he was clearly contractually required to return upon termination; and (3) conveying that

confidential information to new employer Enerco to help it convince his former accounts to switch vendors.

In count two, RMC claims that Enerco tortiously interfered with its business relationships with existing customers.[1]  Enerco correctly reminds the court that it was not a party to Vandenberg's non-solicitation and non-disclosure contract and is not bound by it.

**For the reasons which follow, the court will deny both defendants' motion for summary judgment.  On count one, there is sufficient circumstantial evidence in the record for a reasonable factfinder to find that Vandenberg breached his contractual noncompetition and nondisclosure obligations.**[2]  Perhaps most damaging to Vandenberg's motion, he admittedly kept a sizeable volume of confidential information for a long period of time after leaving RMC, with no legitimate justification.  In light of Vandenberg's increasing dissatisfaction with RMC, and the very

---

[1]

Enerco has not contended that the tortious-interference claim is untimely, and it appears to be timely.  *See DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 471 (6th Cir. 1996) ("The statute of limitations for a claim of tortious interference with business relationships is three years.") (citing MICH. COMP. LAWS § 600.5805(8) & *James v. Logee*, 388 N.W.2d 294, 295-96 (Mich. App. 1996)).

[2]

"Under Michigan law, an agreement by an employee not to compete is permissible if the agreement is reasonable."  *Edwards Pubs., Inc. v. Kasdorf*, 2009 WL 131636, *3 (Mich. App. Jan. 20, 2009) (P.J. Murphy and JJ. K.F. Kelly & Donofrio) (citing *Therma-Tool Corp. v. Borzym*, 575 N.W.2d 334 (Mich. App. 1998)).  Specifically,

"a restrictive covenant must protect an employer's reasonable competitive business interests, but its protection in terms of duration, geographical scope, and the type of employment or line of business must be reasonable. [A] restrictive covenant must be reasonable as between the parties, and it must not be specially injurious to the public."

*Edwards Pubs.*, 2009 WL 131636 at *3 (quoting *St. Clair Medical, P.C. v. Borgiel*, 715 N.W.2d 914 (Mich. App. 2006) (interpreting Michigan Antitrust Reform Act, MICH. COMP. LAWS 445.774(a)).  In any event, the defendants have not contended that the RMC-Vandenberg non-competition and non-disclosure covenants are unenforceable as against Michigan statute or public policy.

-3-

quick exodus of his customers from RMC to Enerco after his move, a reasonable factfinder could find that he kept the confidential information with the intent of using it to help Enerco win his former customers, and that he actually did so despite his testimony to the contrary.

**Although count two presents a closer call, a reasonable factfinder could conclude that Enerco tortiously interfered with RMC's business relationships**, namely by (1) accepting confidential RMC pricing information from Vandenberg when it knew that such information was the fruit of a willful breach of contract and breach of the duty of loyalty, and using that information to under-bid RMC or otherwise persuade customers to switch; (2) soliciting entities that it knew were former RMC customers of Vandenberg, when that knowledge came only from Vandenberg's willful breach of contract and breach of the duty of loyalty, and (3) perhaps requiring or encouraging Vandenberg to engage in those breaches as a condition of getting or keeping the job with Enerco. RMC admits that Enerco did not commit any act that was "wrongful *per se*", i.e., wrong under any circumstances and at all times, so that avenue for establishing tortious interference is not available. But RMC correctly contends that under the circumstances, a reasonable factfinder could find that Enerco's actions were malicious and unethical, which is the other way of establishing tortious interference with business relationships under Michigan common law.

### BACKGROUND

Vandenberg worked as an industrial-chemicals sales representative with the Schaefer company for about 20 years, with primary responsibility for selling corrosion inhibitors and biocides to school districts, hospitals, and municipalities. *See* Defendants' Motion for Summary Judgment filed Jan. 30, 2008 ("MSJ"), Ex 2 - Deposition of Defendant Douglas Vandenberg ("Van Dep")

13:24 to 14:6 and 17:10-12 and 18:6 and 71:5-19.[3]  On September 1, 2004, Schaefer announced that it was being purchased by RMC;[4] that same day, Vandenberg signed the Non-Competition and Non-Disclosure Agreement with RMC.  *See* Van Dep 48 to 58.  The agreement provided, in part,

> 1. Employment.  * * *  [E]mployee will . . . comply with all employment policies, and obey al rules, regulations and special instructions that now exist or that may be established by RMC from time to time.

> 2.  Standard of Performance.  Employee agrees to serve RMC diligently and faithfully . . . .  Employee agrees to perform to the best of his or her ability and experience all of the duties and obligations either expressly or implicitly required by the terms of this Agreement at all times loyally and conscientiously.
>                                                                     * * *
> 5. Return of Property.  *Upon termination of Employee's employment, Employee will immediately return to RMC all documents related to RMC and all property of RMC* in as good a condition as when received by Employee (normal wear and tear accepted [sic]), *including client lists*, RMC issued keys, *computer printouts or software, records, manuals (including the RMC Employee handbook), promotional materials,* equipment and supplies.  It is specifically agreed that any documents, card files, notebooks, Rolodexes, etc. containing customer information are the property of RMC, regardless of by whom they were compiled.

> 6. RMC's Protectible Interest and Confidential Information.  RMC is in the business of manufacturing, marketing, distributing, selling and servicing specialty chemicals and related equipment and supplies in its . . . institutional [and] . . . water energy . . . divisions.  In doing so, it has built up and established an extensive trade, reputation and good will in the industry.  Employee acknowledges and agrees that as a result of the nature of RMC's business and the nature of Employee's position with RMC, Employee has and will come into contact with, have access to and learn various

---

[3]

The defendants further allege that "[t]hroughout his employment with Schaefer, Vandenberg was aware of several competitors in Michigan, including Mitco, Enerco, Venture Seven, and Betz.  Vandenberg was unaware of RMC, however, until on or about September 1, 2004, when it was announced that RMC was buying Schaefer."  MSJ at 2 (citing Vandenberg Dep 17:10 to 18:1 and 47:1 to 60:24).  The court determines that the question of whether or not Vandenberg was aware of RMC's existence before it bought Schaefer is not material to a determination of any of the elements of the contract claim against him.  Thus it has no bearing on the propriety of summary judgment.

[4]

Vandenberg alleges that his duties with RMC were nearly identical to his duties with Schaefer, *see* Van Dep 60:8 to 63:14, and RMC does not contest this.

technical and non-technical trade secrets and other Confidential Information, which are the property of RMC.

Such *Confidential Information includes, but is not limited to*:

(a) trade secrets, methods, procedures, devices and other means used by RMC in the conduct of its business, marketing plans and strategies, advertising plans and strategies, pricing plans and strategies . . . databases . . . and all other matters of a technical nature, all of which Confidential Information is not publicly available but has been developed by RMC at its great effort and expense;

(b) *the names and addresses of RMC's customers (including, but not limited to, customer lists), and their representatives responsible for entering into contracts with RMC, customers [sic] leads and referrals, specific customer needs and requirements and the manner in which they have been met by RMC, the terms of contracts and leases entered into between RMC and its customers, and similar information relating to RMC's customers and new business prospects*, all of which Confidential Information is not publicly available but has been developed, acquired, and compiled by RMC at it[s] great effort and expense; and

(c) information with respect to RMC's employees.

7. <u>Non-Disclosure of Confidential Information</u>. *Employee will not, while employed by RMC or at any time thereafter, directly or indirectly disclose or make use of any Confidential Information (as described in the above paragraph) or trade secrets of RMC*, except to perform Employee's duties for RMC.

\* \* \*

12. <u>Non-Solicitation of Customers.</u> *Employee will not while employed at RMC, and for a period of one (1) year following termination of employment, directly or indirectly by assisting others, solicit or accept, or attempt to solicit or accept, any business from any RMC customer with whom Employee had material contact* (i.e. dealt with, supervised dealings with, or had resultant earnings on) during employment with RMC.

\* \* \*

14. <u>Enforcement</u>

\* \* \*

F. <u>Entire Agreement.</u> This Agreement contains all the understandings and agreements between the parties concerning Employee's employment. Employee acknowledges that no person who is either an agent or employee of RMC may orally or by conduct modify, delete, vary, or contradict the terms and conditions set forth herein.

MSJ Ex 1 (paragraph breaks added, italics added, underlining in original). RMC states, without

contradiction from the defendants, that there were no written modifications to the agreement

between September 1, 2004 and the effective date of Vandenberg's resignation, July 7, 2007, *see* P's Opp at 4 (citing Sealed Ex B at RMC Bates No. 183), and none of the parties alleges any modification of the agreement by oral agreement or conduct.

**September 2004: Plaintiff RMC Buys Schaefer and Becomes Vandenberg's Employer.** Vandenberg alleges that after RMC took over in September 2004, the level of service provided to his accounts declined, e.g., at least two customers expressed dissatisfaction with delivery times and "problems maintaining sulfite residuals on the oxygen scavengers." *See* Van Dep 75:4-8 ("there were a lot of changes being made and it was impacting my customers . . . . Delivery times were not as good as they had been with Schaefer.") and 76:10-19 and 78:4-5 and 79:3. At oral argument, Vandenberg's counsel alleged that some of Vandenberg's former customers who spoke to Enerco complained that RMC was trying to charge higher prices than the Schaefer company had.

Defendant Enerco's president, Bob Othmer, testified that Vandenberg's reputation as a long-term Schaefer representative who was good at selling, took care of his accounts, and kept his accounts, motivated Enerco's interest in hiring Vandenberg away from RMC. Enerco-Othmer Dep (MSJ Ex 3) 13:2-10, and 13:25 to 14-9, and 36:1-4; *see also* Deposition of Enerco Sales Manager JoAnn Cranson (MSJ Ex 5) ("Enerco-Cranson Dep") 17:7 to 18:6.

**December 2005: Vandenberg Declines Enerco's First Job Offer, But He Reconsiders After His Relationship with RMC Declines.** After one year, RMC rated Vandenberg's overall performance positively, as reflected in his written September 2005 Performance Appraisal. *See* P's Opp, Sealed Ex C at Bates Nos. 199-202. In October 2005, something happened which the defendants treat as customary and mundane but RMC refers to as "an incident . . . which called into question his loyalty to RMC and which gave RMC reason to believe that Vandenberg was working cooperatively with Enerco to RMC's detriment [while he was still employed by RMC]." P's Opp

at 5.  Specifically, while Vandenberg's successor sales representative Brian Keenan was visiting
RMC customer Michigan Air National Guard, he found a Field Water Service Report prepared by
Vandenberg and dated October 27, 2005.  In the report, Vandenberg noted that he had recommended
that this customer add two gallons of Enerco product No. E3222 (and not any RMC product).  *See*
RMC-Keenan Dep (P's Opp Ex C) at 48 to 50; RMC-Waidelich Dep (P's opp Ex D) at 47 & 49 &
51 (P's Opp Ex D); *see also* MSJ Ex 4 (RMC Bates No. 43).[5]

**In early December 2005, Enerco's Othmer contacted Vandenberg, who said he was**
**satisfied working at RMC but met Other to "investigate possibilities".**  Sometime after that
meeting, Enerco made Vandenberg a written job offer, which he declined on January 11, 2006.  *See*
Van Dep 100:19-20 and 102:2-6 and 105:24-25; *see also* Enerco-Othmer Dep (MSJ Ex 3) 14:21 to
15:15; Cranson Dep (MSJ Ex 5)18:15-20.  By early 2007, however, Vandenberg's sales to RMC
customers were declining and he was admittedly not meeting new-business development goals,
leading RMC to put him on a Performance Improvement Plan ("PIP").  In response, Vandenberg
began to feel dissatisfied with his job at RMC, so at his request, Enerco drafted a new offer, which
he accepted sometime before June 22, 2007, when he gave "two weeks notice" to RMC.  *See* Van
Dep 112:6 to 114:1, and 117:3-5, and 119:1 to 120:21, and 125:12-14; *see also* Cranson Dep (MSJ
Ex 5) 20:11-24.

Vandenberg's Contact with RMC Customers After Giving Two Weeks Notice.  Vandenberg
alleges that "[i]n preparation for his departure from RMC, [he] did not undertake any mass mailing

---

[5]

At this stage, neither side has introduced expert testimony (from someone not employed by
the parties) as to whether it is accepted practice in this industry to recommend, in some
circumstances, that a customer use a competitor's product.

to his RMC customers announcing his change of employment." Rather, he claims he informed only those RMC customers that he was already scheduled to visit during his last two weeks with RMC. Vandenberg claims he told those customers that he was going to work for Enerco and that  a noncompetition agreement prohibited him from contacting or working with his RMC customers for one year.  *See* Van Dep 126:6-12, and 128:22 to 129:8, and 131:9-10 and 132:7-11.  RMC counters that while Vandenberg told the customers that he could not call on them for a year, he made sure he "spoke to all four of his largest customers" during his final two weeks on the job.  P's Opp at 7 (citing Ex A, Van Dep Excerpt at 125 to 127 and 130 to 131).[6]


<u>Vandenberg's Admitted Retention of Certain RMC Confidential Information after Leaving.</u>

On the day that Vandenberg resigned, RMC advised him in writing that he was obligated to return

---

[6]

The record does not disclose precisely which customers Vandenberg had a previously-scheduled or "standing" appointment to see during those two weeks.  More specifically, the record does not disclose whether he had a  previously-scheduled or "standing" appointment to visit any of the customers who later switched from RMC to Enerco.  If the parties have written records showing Vandenberg's schedule during that important period, the court would benefit from seeing them.

The next inquiry would be whether Vandenberg spoke to any of his customers with whom he did *not* have such an appointment (especially the customers who switched).  If he did, the factfinder will consider whether to draw the inference that Vandenberg "went out of his way", in an interaction not directly required or occasioned by his job duties, to alert customers that he would soon be at Enerco.  That would arguably constitute a breach of a contractual duty in itself, though not a breach for which RMC seeks to recover on its own.  *See* MSJ Ex 1, Agreement § 2, Standard of Performance ("Employee agrees to serve RMC diligently and *faithfully* . . . .  Employee agrees to perform to the best of his or her ability and experience all of the duties and obligations either expressly or implicitly required by the terms of this Agreement at all times *loyally* and conscientiously.") (emphasis added).

Combined with other circumstances, a finding that Vandenberg violated the contractual duty of loyalty while still an RMC employee could make it more plausible, and more likely, that Vandenberg continued that animus *after* leaving, in a way that breached his nonsolicitation/nondisclosure agreement.

all company property to sales manager Matt Blossom.  *See* P's Opp, Sealed Ex G (RMC Bates No. 207).  Vandenberg alleges that at or shortly after the time he left RMC, he returned "all documents *requested by RMC*", MSJ at 5 (citing Van Dep 131:2-8 and 133:7-12) (emphasis added).  He notes, however, that "RMC never asked for information asked on Vandenberg's computer, and . . . Vandenberg remained unaware of the presence of such RMC documents on his computer" until RMC's counsel requested such information in discovery.  MSJ at 5 (citing Van Dep 133:17-18, and 139:17-23, and 141:21 to 142:3.

RMC, however, points out that Vandenberg did not return the remaining information until January 7, 2009, over a year and five months after he left the company.  At oral argument, RMC's counsel accurately noted that Vandenberg's contract required the immediate return of *all* RMC documents and information.  *See* MSJ Ex 1, Agreement § 5, Return of Property ("Upon termination of Employee's employment, Employee will immediately return to RMC *all* documents related to RMC and *all* property of RMC . . . including client lists . . . computer printouts or software, records, manuals . . . promotional materials . . . .").

Moreover, Vandenberg has not explicitly contended that RMC's oral request for the return of certain materials somehow effected a modification of his contractual obligation to return *all* materials.  Indeed, Vandenberg would be hard-pressed to make such an argument in the face of section 14-F, Enforcement-Entire Agreement, which contains an integration clause stating,

> This Agreement contains all the understandings and agreements between the parties concerning Employee's employment.  Employee acknowledges that *no person who is either an agent or employee of RMC may orally or by conduct modify, delete, vary, or contradict the terms and conditions set forth herein*.

MSJ Ex 1 (emphasis added).  *See Bero Motors, Inc. v. GMC*, 743 N.W.2d 886, 887 (Mich. 2008) (J. Corrigan, dissenting from denial of leave to appeal, joined by J. Markman) ("in *Quality Products*

& *Concepts Co. v. Nagel Precision, Inc.* . . . 666 N.W.2d 251 (2003), this Court held that a party who seeks to prove that a written agreement prohibiting oral modifications was [nonetheless] orally modified must prove by clear and convincing evidence 'that the parties mutually intended to modify the particular original contract, including its restrictive amendment clauses such as written modification or anti-waiver clauses.'")

RMC characterizes the documents retained by Vandenberg as "voluminous", consisting of "hundreds of documents 'related to RMC'", and it offers representative examples of those documents containing confidential customer, product, price and sales data. *See* P's Opp at 8, citing ex H (correspondence between counsel) and Sealed Ex I (confidential documents). And, contrary to Vandenberg's intimation that the only information he retained was information stored on his computer without his awareness, RMC notes that "[a]dditionally, on October 23, 2008 Defendants' counsel sent to Plaintiff's counsel 102 pages of documents 'related to RMC' that Vandenberg had been keeping in a file cabinet in his home office since he received them from RMC while still in its employ", including confidential customer, product, price and sales information which Vandenberg admitted he had no right to use or share with others. *See* P's Opp at 8-9, citing Van Dep Excerpt (P's Opp Ex A) at 133 to 140. An RMC official testified that there was no legitimate reason for Vandenberg to keep these paper documents for more than a year after he went to work for a direct competitor, *see* Waidelich (P's Opp Ex D) at 65 to 66, and Vandenberg does not dispute this statement.

Enerco and Vandenberg's Contacts with RMC Customers after Vandenberg left RMC. Vandenberg's last day of work at RMC was Friday, July 6, 2007, and he began working for Enerco on July 9, 2007. *See* Comp ¶¶ 27, 28 and 31; *accord* Van Dep 125:18-20 and Cranson Dep (MSJ

Ex 5) 36:2-4.  **The defendants allege that** as a condition of Vandenberg's employment, Enerco prohibited him from contacting his former RMC customers or making efforts to land their accounts during his first year with Enerco, including returning the customers' telephone calls for any reason. *See* Enerco-Othmer Dep 30:7-10 and 36:15-16 and 56:3 to 57:17.

Vandenberg alleges that he therefore "severed all ties" with his former RMC customers, "including some social relationships that had developed over the years," though he admits he met employees of two of his former customers (the Holland and Portage, Michigan school districts) for breakfast and lunch on two occasions.  He claims they did not discuss business with them and that at that time he did not know they had already switched from RMC to Enerco.  *See* Van Dep 151:15 to155:8.  Enerco's Waidelich testified, in essence, that it has no *direct* evidence to the contrary.  *See* Deposition of Waidelich ("Waidelich Dep") (MSJ Ex 6) 42:24 to 43:18 and 47:24 to 48:18.

Vandenberg alleges that only one of his former RMC customers tried to contact him at Enerco (Brian Steadman from Veteran's Home).  According to Vandenberg, instead of returning the call he forwarded it to Othmer, who called the man and explained that Vandenberg's noncompete contract with RMC prohibited Vandenberg from speaking with him.  It is undisputed that Enerco's Othmer declined to discuss potential business with Steadman and referred him back to RMC, advising him to stay with RMC until Vandenberg's year was done.  *See* MSJ at 6 (citing Van Dep 155:9-22; Enerco-Othmer Dep 56:18 to 57:20; Enerco-Cranson Dep 35:9-12; and RMC-Waidelich Dep 67:15-21); *accord* P's Opp at 12.

For its part, Enerco admits that it "gained many new customers during the first twelve months of Vandenberg's employment with Enerco, including some former RMC customers", but it claims it did not "solicit" or "initiate contact" with any of Vandenberg's former RMC customers. *See* Enerco-Othmer Dep 37:15-25 and Enerco-Cranson Dep 25:5-12 and 27:9 to 29:10.  RMC

-12-

identifies 14 customers who it alleges switched to Enerco because of anti-contractual or tortious solicitation by Enerco and/or Vandenberg.  *See* Docket #51.  Enerco alleges that four of those "switching" customers "were already active customers of Enerco" – Thornapple Manor, Fennville Schools, Caledonia Schools, and Byron Center Schools – and Enerco "had prior business dealings with at least two others – Pennfield School District and Hamilton Lumber."  MSJ at 7, citing Othmer Dep (MSJ Ex 3) 39:21 to 41:11, and Enerco Bates Nos. 1-45 (MSJ Ex 7) and 363-783 (MSJ Ex 8).

**RMC responds that** even if this is true, ten of Vandenberg's former RMC customers stopped doing business with RMC after he started working for Enerco in July 2007.  RMC notes that Enerco President Othmer *initiated* contact with two former Vandenberg RMC customers, Pennfield Schools and Hamilton Lumber, did not cease contact with Pennfield upon learning that it had been a Vandenberg RMC customer, and admitted that he knew when he spoke to Hamilton Lumber that it had been a Vandenberg RMC customer.  P's Opp at 11, citing Othmer Dep Excerpt (P's Opp Ex E) at 38 to 41.

**Enerco points to the testimony** of RMC's designated representative that "if a former RMC customer initiates the contact, Enerco is not prohibited from doing business with this customer", MSJ at 6 (citing RMC-Waidelich 48:23-25 and 52:9 to 53:3 and 56:11-16); *see also* P's Opp at 11 ("According to Othmer, a response to a request for a proposal to do business with a customer is not the 'solicitation' of that customer's business.") (citing Othmer Dep (P's Opp Ex E) 38).

**RMC responds that** on July 9, 2007, just Vandenberg's third day on the job for Enerco, Enerco President Othmer and Sales Manager Cranson began speaking with many of his former RMC customers "in aggressive pursuit of their business."  Specifically, Enerco's Cranson spoke to Portage Schools,  following up by faxing a memorandum to Bruce Dentler, who had been Vandenberg's main contact there.  Enerco followed up by having Othmer and Cranson meet a Portage Schools

-13-

representative on August 2, 2007 and submit a written proposal on August 15, 2007.  *See* P's Opp at 9, citing Vandenberg Dep Excerpt (P's Opp Ex A) 38 and Ex F (Enerco Bates Nos. 132 and 527-33).  RMC also points out that in those same first three days, Othmer and Cranson met with Kalamazoo Schools and Battle Creek Schools representatives; together with Portage Schools, those were three of Vandenberg's four largest RMC customers.  *See* P's Opp at 9, citing Cranson Dep Excerpt (P's Opp Ex K) 36 and Ex F (Enerco Bates No. 131).

Still in the summer of 2007, Enerco also submitted written proposals to the government school systems in Kalamazoo, Battle Creek, Holland, Caledonia, and Lakeview.  *See* P's Opp Ex F, Enerco Bates Nos. 395-405 and 441-46 and 561-64 and 672-75 and 774.  All five of these school systems asked RMC's Keenan to provide price quotes, but none of them asked RMC to submit bid proposals as Enerco was doing.  *See* P's Opp Ex L (Keenan Dep Excerpt) 56 to 59.  RMC submits undisputed evidence showing that, in the summer and fall of 2007, many of these customers stopped buying from RMC and started buying from Enerco instead.  *See* P's Opp, Sealed Ex M (RMC Bates Nos. 3-38 and 349-412).  In total, RMC notes that Enerco admits that "11 or 12" of Vandenberg's former RMC customers became Enerco customers instead, during the one-year duration of Vandenberg's noncompetition / nondisclosure agreement, *as a result of meetings with Othmer and/or Cranson*.  *See* P's Opp at 11, citing Othmer Dep Excerpt (P's Opp Ex E) 41 to 42 (emphasis added).  But Enerco correctly notes that its president, Othmer, also testified that of those 11 or 12 customers, Enerco had done business with "[a]t least four, maybe six" in the past.  Othmer further stated that and at least three were still active customers at the time Vandenberg joined Enerco: "Byron Center was active.  Caledonia was active.  Thornapple Manor was active.  There also may have been others.  Those three come to mind."  Defs' Reply at 9 (citing Othmer Dep 43:7-22).

RMC views as specious and dishonest Enerco president Othmer's reasoning regarding which

-14-

of Vandenberg's former customers he was comfortable talking and "pitching" services/products to.
Othmer testified that he was not ethically comfortable soliciting the business of Veterans Home,
because that customer had called Vandenberg, who forwarded the call (or a voicemail) to Othmer.
In Othmer's view, Michigan Home therefore came "through Vandenberg."  By contrast, Othmer
stated that he had no such objection to working for the Kalamazoo, Battle Creek, Marshall and
Portage Schools, because they had not called Vandenberg after his move to Enerco.  *See* P's Opp,
citing Ex E (Othmer Dep) 56.  RMC contends that these four customers also "came 'through
Vandenberg'" because he had told them that he was leaving RMC and joining Enerco.  RMC implies
that all those customers initiated contact with Enerco solely or primarily because they knew
Vandenberg was there.  In other words, in RMC's view, Othmer's own stated reasoning should have
led Enerco not to solicit or do business with *any* of Vandenberg's former customers during the one-
year either.  P's Opp at 12, citing Van Dep 125 to 126.[7]

_____

[7]

For purposes of the instant motion, the court need not decide whether Enerco initiated
contact with a former Vandenberg customer or merely responded to their inquiry.

It is true that Enerco's solicitation could be material to whether *Vandenberg* breached Section
12, Non-Solicitation of Customers:  "Employee will not . . . for a period of one (1) year following
termination of employment, directly or *indirectly by assisting others, solicit* or accept, or attempt
to solicit or accept, any business from any RMC customer with whom Employee had material
contact . . . ."  Emphasis added.  One could arguably violate this provision by enabling or helping
one's new employer to solicit one of his former RMC customers.

But as discussed below, RMC has shown a genuine issue as to whether Vandenberg violated
Section 12 in a different way:  not "indirectly by assisting others, [to] *solicit* . ..  any business from"
his former RMC customer, but "indirectly by assisting others, [t]o *accept*, or attempt to . . . accept,
any business from" such a customer.  That is enough for RMC's contract claim against Vandenberg
to survive summary judgment.  It does not matter whether RMC has also shown a genuine issue as
to whether Vandenberg breached the non-solicitation provision in a second way.

-15-

Vandenberg's Comments on Jan. 2008 Self-Evaluation at Enerco.  After working for Enerco

about six months, in January 2008, Vandenberg filled out an Employee Self-Evaluation Form before

his July-December 2007 performance review with sales manager Cranson.  In response to the

question "What are my major accomplishments for the past year?", Vandenberg wrote "Got Rid of

RMC."  In response to the question, "What are my key goals for the next year?, Vandenberg wrote

"Take over my old accounts."  *See* P's Opp Ex F, Enerco Bates Nos. 194-95, and P's Opp Ex K

(Cranson Dep Excerpt) 44 to 49.  RMC contends that

> the *only* common sensical [sic] meaning of this phrase in the context of the question
> asked is that Vandenberg, with the assistance of Othmer and Cranson, fulfilled his
> hope that Enerco would be able to lure his former RMC customers away from RMC,
> i.e., "get rid of RMC", so that he could then take over those "old accounts" in the
> following year when his non-solicitation agreement expired.

P's Opp at 13.  The court agrees that a factfinder could reasonably interpret Vandenberg's written

comments in this fashion.  Such a reading of Vandenberg's comments is consistent with the theory

that he acted in violation of his RMC agreement in order to help Enerco win his former customers

from RMC.  But the court cannot agree that RMC's reading of those comments is the *only* sensible

reading.  For example, listing "Got rid of RMC" as a major accomplishment could have been merely

Vandenberg's humorous way of expressing relief that he was no longer working for RMC, where

he had become less satisfied recently.

Next, Vandenberg's listing "taking over my old accounts" as a key goal "for the next year"

does not necessarily reflect any desire or intention to accomplish that goal by means that violated

his nonsolicitation/nondisclosure agreement.  The statement leaves open the possibility that

Vandenberg would resume serving his former customers after Enerco – through no improper

interference of its own and with no improper help from him – convinced them to leave RMC.

Moreover, when Vandenberg filled out the Self-Evaluation form in January 2008, he had

-16-

already been working for Enerco for about half a year. Thus, "the next year" from the date of his

self-evaluation included six months during which he was still subject to the RMC agreement, but

also six months after those strictures expired. As with other pieces of evidence adduced by RMC,

a reasonable factfinder might or not interpret them the way RMC urges, but it is enough to create

a genuine issue of material fact as to Vandenberg's breach of the agreement.

      <u>Why Did Customers Switch from RMC to Enerco: The Alleged Breach of Contract and Tort, or Other Reasons?</u> Enerco and Vandenberg suggest that customers switched from RMC to

Enerco because they were well satisfied with Vandenberg's customer service and were loyal to him,

*see* Van Dep (MSJ Ex 2) 36:6-13 & Enerco-Othmer Dep (MSJ Ex 3) 44:25 to 45:6. Enerco submits

affidavits from several customers saying they switched from RMC to Enerco because they had

become dissatisfied with RMC's performance, delivery, products and/or pricing. *See* MSJ Ex 8

(affidavits) and MSJ Ex 9 - Deposition of RMC Sales Representative Brian Keenan ("Keenan Dep")

pages 20 to 24, 28 to 29, and 32 to 33. Enerco presents deposition testimony explaining that other

customers switched from RMC to Enerco "because they decided to continue using the product

provided by a contractor, or because others in their industry were switching." *See* Keenan Dep (MSJ

Ex 9) 33:6-17 and 40:8 and 46:21-22. RMC suggests, of course, that the customers switched

because of tactics that violated Vandenberg's agreement and Enerco's common-law obligations.

      **PROCEDURAL HISTORY**

      RMC filed the complaint in January 2008, the defendants timely filed an answer in March

2008, and the parties engaged in discovery, including the production of over 1,500 documents by

the defendants. Following a discovery dispute and the entry of a protective order, the defendants

moved for summary judgment on January 30, 2009, RMC filed an opposition brief on March 2, 2009, and the defendants filed a reply brief on March 16, 2009.  The court has scheduled a settlement conference for Tuesday, June 23, and if necessary the final pretrial conference for Thursday, July 2 and a bench trial commencing Monday, July 20, 2009.

## DIVERSITY JURISDICTION

When sitting in diversity jurisdiction, this court must apply the choice-of-law rules and, if applicable, the substantive law of the forum State, Michigan.  *Amerisure Mut. Ins. Co. v. Carey Transp., Inc.*, 578 F. Supp.2d 888, 897 (W.D. Mich. 2008) (Paul L. Maloney, C.J.) (citing *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409-10 (6th Cir. 2008) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003))); *see also Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) ("We generally apply the substantive law of the forum state to actions brought pursuant to our diversity jurisdiction.") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

When interpreting contracts in a diversity action, the federal courts also generally enforce the parties' contractual choice of governing law.  *Amerisure*, 578 F. Supp.2d at 897 (citing *Savedoff*, 524 F.3d at 762 (citing *Carnival Cruise Lines, Inc. v. Schute*, 499 U.S. 585, 596 (1991) and *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)))).  As the parties agree that the contract and the alleged tortious conduct are governed by Michigan substantive law, *see* P's Opp at 1 and Defs' SJ at 17 n.8, the court applies Michigan law to this dispute.  *See, e.g., Savedoff*, 524 f.3d at 762 ("As the parties do not dispute that the student loan contracts at issue are governed by Ohio law, we apply Ohio law to the parties' contractual dispute."); *Lakeland Reg. Health Sys. v. Walgreen's Health Initiatives, Inc.*, 2009 WL __, * __ (W.D. Mich. Mar. 25, 2009) (Maloney, C.J.) (although the

-18-

contract at issue had a choice-of-law clause calling for the application of Illinois substantive law, "Nonetheless, WHI contends that Michigan law governs the tort issues in this case . . . and plaintiff Lakeland's brief also proceeds under Michigan law.  Accordingly, the court will apply Michigan law to the determination of whether Lakeland has a cognizable tort cause of action against WHI."); *State Farm Fire & Cas. Co. v. Liberty Ins. Underwriters, Inc.*, 2009 WL 702863, *4 (W.D. Mich. Mar. 16, 2009) (Maloney, C.J.) ("As the parties do not dispute that the interpretation of the policies is governed by Michigan substantive law, the court applies Michigan law to this dispute."); *Amerisure*, 578 F. Supp.2d at 897 ("As the parties do not dispute that the Amerisure-Carey policy is governed by Michigan substantive law, the court applies Michigan law to this dispute.").

## A FEDERAL COURT'S APPLICATION OF STATE LAW

"'In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court.'" *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, – F. Supp.2d –, –, 2008 WL 828112, *14 (W.D. Mich. 2008) (Paul L. Maloney, J.) ("*ARS*") (quoting *NUFIC of Pittsburgh v. Alticor, Inc.*, 472 F.3d 436, 438 (6th Cir. 2007) (Griffin, J.) (citation omitted)).  If the state supreme court has not conclusively decided the issue, a federal court presumptively looks to the decisions of the state's appellate courts:  "In anticipating how the state supreme court would rule, 'we look to the decisions of the state's intermediate courts unless we are convinced that the state supreme court would decide the issue differently.'"  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *US v. Lancaster*, 501 F.3d 673, 679 n.3 (6th Cir. 2007) (Griffin, J.) (citation omitted)); *see also West v. AT&T Co.*, 311 U.S. 223, 236-37 (1940) ("A state is not without law save as its highest court has declared it.  There are

many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them. In those circumstances the federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court . . . .").

In determining what is the controlling law of the State, a federal court also "*may* give weight" to the decisions of the State's trial courts, *Bradley v. GMC*, 512 F.2d 602, 605 (6th Cir. 1975) (citing *Royal Indem. Co. v. Clingan*, 364 F.2d 154 (6th Cir. 1966)), especially when the trial court's decision is consistent with state appellate decisions, *Bradley*, 512 F.2d at 605. The federal court is not *obligated*, however, to follow state trial-court decisions. *Am. Int'l Ins. Co. of P.R. v. Lampe GmbH*, – F. App'x –, –, 2009 WL 59145, *1 (3d Cir. 2009) (citing *Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 199 (3d Cir. 2004)).

## PRECEDENTIAL VALUE OF MICHIGAN DECISIONS

A federal court must accord the same precedential value to a state-court decision as it would be accorded by that state's courts. *See ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp. 386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision (*Fid. Union Trust Co. v. Field*, 311 U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey trial court decision that such a decision would receive in that state's court system under the peculiarities of New Jersey law.")). If a state court would not be bound by a particular state-court decision, then neither is this court. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *King v. Order of United Commercial Travelers of America*, 333 U.S. 153, 161 (1948) ("a federal court adjudicating a matter of state law

in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (cite omitted)).

Michigan Court Rule 7.215(C)(2) states that "[a] published decision of the Court of Appeals has precedential value under the rule of stare decisis." This subsection makes no distinction based on when the decision was issued.. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14.

However, Michigan Court Rule 7.215(J)(1) provides that "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after November 1, 1990*, that has not been reversed or modified by the Supreme Court or by a Special Panel of the Court of Appeals as provided in this rule." . *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (emphasis added).

Synthesizing Michigan Court Rules 7.215(C)(2) and 7.215(J)(1), the Michigan Court of Appeals accords precedential value to *all* of its prior published decisions, regardless of when they were issued. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14. When a post-November 1, 1990 published Court of Appeals decision conflicts with a *pre*-November 1, 1990 published Court of Appeals decision, however, the *post*-November 1, 1990 decision prevails. *Id.*

When there is a conflict between two published decisions of the Court of Appeals that were *both* issued *after* November 1, 1990, Michigan courts must follow the first opinion that addressed the matter at issue. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W. 2d 546, 554 (Mich. App. 1999) (citation omitted)).

By contrast, Michigan Court of Appeals panels are not bound by *un*published decisions of that same court, regardless of when they were issued. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Iqbal v. Bristol West Ins. Group*, 748 N.W.2d 574, 582 n.5 (Mich. App. 2008) (citing

-21-

MICH. CT. R. 7.215(J)(1))).  Nonetheless, this court may consider unpublished state-court decisions, so long as they do not contradict published decisions of the Michigan Supreme Court or Michigan Court of Appeals.  *See Republic-Franklin Ins. Co. v. Bosse*, No. 95-3401, 89 F.3d 835, 1996 WL 301722, *5 n.4 (6th Cir. June 4, 1996) (although unpublished decisions are not generally controlling under Ohio law, "[w]e cite them, nevertheless, due to our sensitivity to state law in deciding diversity cases.") (citing *Royal Indem. Co.*, 364 F.2d at 154 ("Although we are not bound in a diversity case by an unreported decision of a State court of original jurisdiction, we may give weight to this [unreported] decision of the chancery [court] in determining what is the controlling [state] law.")).

Finally, a federal court's interpretation of state law is not binding.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court) on a question of state law is not binding on state tribunals . . . ."); *accord McGrath v. Toys 'R Us, Inc.*, 356 F.3d 246, 250 (2d Cir. 2004) (citing *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 90 (2d Cir. 1996)); 20 AM. JUR. 2D COURTS § 225 (1965).  As our Circuit recently emphasized,

> No federal court has the final say on what [state] law means.  Even the decision of the highest federal court, the United States Supreme Court, about the meaning of [a state] law has no more binding authority on the [state] Supreme Court than the decision of [another State's] Supreme Court or for that matter any other court.

*Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 472 (6th Cir. 2008).

Accordingly, this court will seriously consider our Circuit's interpretation of state law, or another district court's interpretation of state law, but is not bound by it.  *See ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15; *see also Pack v. Damon Corp.*, 2006 WL 1156489, *1 (E.D. Mich. May 1, 2006) ("Michigan courts, in turn, are not bound by the Sixth Circuit's interpretation of Michigan

law."). *See, e.g., Michigan Protection & Advocacy Servs. v. Michigan DOC*, 581 F. Supp.2d 847, 856 (W.D. Mich. 2008) (Maloney, C.J.) ("*MPAS*") (declining to follow U.S. District Court for the Eastern District of Michigan's determination that MDOC is a political subdivision of the State of Michigan, a matter of state law).

**DISCUSSION:  Breach of Contract Claim Against Vandenberg**

**Tortious Interference with Business Relationship Claim Against Enerco**

Enerco admits that in general, it uses competitors' product data and other information whenever it is available, but it denies that it received any RMC product or pricing information from Vandenberg or through any illicit means.  MSJ at 8.  Enerco's Othmer testified that in the normal course of business, a good sales representative can readily learn which accounts a competitor has simply by looking around the facilities they visit (because products are often plainly labeled and stored in plain view) and that they can legitimately obtain competitors' product and sometimes pricing information simply by asking the customers.  *See* Enerco-Othmer Dep (MSJ Ex 3) 17:21-22 and 26:1-6 and 28:24 to 29:8; *see also* Enerco-Cranson (MSJ Ex 5) Dep 22:13-18.   Enerco emphasizes that even when it can obtain a competitor's product or pricing information, it cannot win that customer away from the competitor unless the customer is convinced that Enerco provides a better combined value in terms of quality, delivery, price, and service.  MSJ at 8 (citing Enerco-Othmer Dep 22 to 23).

In Enerco's view, RMC's case for tortious interference with business relationships rests on several pieces of evidence which, taken together, are inadequate to permit a rational factfinder to find the elements of breach of contract (by Vandenberg) or tortious interference with business relationships (by Enerco): (1)  Vandenberg, while employed by RMC in October 2005, advising an

RMC customer to use an Enerco product (rather than buy an RMC product); (2) Vandenberg's admitted failure to return confidential pricing and other information to RMC for over a year after he left, and then only when confronted with a discovery request in the instant case; and (3) the close temporal proximity between Vandenberg leaving RMC and many of his customers leaving RMC in favor of Enerco.  MSJ at 9 (citing RMC-Waidelich Dep (MSJ Ex 6) 41:18-21 and 44:104 and 58:11 to 59:4).  Enerco emphasizes that RMC admittedly has no direct evidence that Vandenberg solicited his former customers, that Enerco initiated calls to those customers, that Vandenberg was working on Enerco's behalf before he left RMC, or that Vandenberg or Enerco used RMC's confidential information to unfairly compete with RMC.  MSJ at 9 (citing RMC-Waidelich Dep (MSJ Ex 6) 42:24 to 43:18, and 47:24 to 48:18, and 56:3-25, and 57:1 to 59:22, and 60:20-24, and 73:14-18).

**As to count one, the breach of contract claim against Vandenberg,** Enerco notes RMC's admission that it has no direct evidence that Vandenberg breached either section 7 (Non-Disclosure of Confidential Information) or section 12 of the agreement (Non-Solicitation of Customers).  MSJ at 11, citing Ex 10 (RMC's Answers to Defendants' Requests for Admissions).  Both Vandenberg and Enerco's president Othmer deny that they "solicited" any of his Vandenberg's former customers as they understand the term.  *See* MSJ Ex 14 (Van Affidavit ¶¶ 3-5 and Enerco-Othmer Dep ¶¶ 4-6).

First, the defendants contend that Vandenberg's October 2005 recommendation that a customer keep using an Enerco product should not be viewed as circumstantial evidence that he was disloyal to RMC and later broke his contractual obligation not to solicit RMC's customers and use or help Enerco use RMC's confidential information to do so.  It is undisputed that while Vandenberg was making a field service call to the Michigan Air National Guard on behalf of RMC on October 27, 2005, he noticed a supply of nitrite treatment product, labeled E-3222, which was provided by

a mechanical contractor but was not an RMC product.  *See* Van Dep 87:8 to 88:9; *see also* RMC-Waidelich Dep (MSJ Ex 6) 49:3-20 and 53:4-9 and 58:2-10.   The defendants begin by pointing to RMC's concession that when a mechanical contractor installs a water-treatment system in a new building, it is standard industry practice for that contractor to provide product for that system for a certain period of time.  MSJ at 13, citing RMC-Waidelich Dep (MSJ Ex 6) 50:11-25.

Vandenberg then alleges that it is not unusual for a sales representative to recommend that a customer keep using a product for which it has already paid, even if it was manufactured by a competing company, until that product is depleted, because it benefits the customer by avoiding waste.  Enerco testifies that it expects its sales representatives to follow this practice.  *See* Van Dep 88:1-9 and 89:2-12 and 90:8; *see also* Enerco-Othmer Dep (MSJ Ex 3) 24:19-24.  The defendants find it significant that Vandenberg "freely disclosed his recommendation [of the Enerco product] on that [field service] report", reasoning that if he were acting disloyally to RMC in an effort to help Enerco, he would not have mentioned it to RMC so forthrightly.  MSJ at 14.  (At oral argument, RMC's counsel implied that Vandenberg never provided RMC with the field report containing the controversial product recommendation.  Counsel pointed out that RMC discovered the field report only fortuitously, by seeing a copy on the premises of that customer.)  The defendants also note that that customer, the Michigan Air National Guard, has not switched from RMC to Enerco.  *See* RMC-Keenan Dep (MSJ Ex 9) 61:15-24.

RMC responds by pointing to Vandenberg's testimony that

before recommending the use of Enerco's product [to the Michigan Air NG], he did not review the bid specifications to see if Enerco's product was specified for this particular application; he did not see any problem in terms of RMC's liability to its customer for recommending that it use someone else's product[,] in the event the product did not work properly; he did not even consider whether he had the authority on behalf of RMC to recommend his customer's use of an Enerco product; and he can't remember if he had ever before made such a recommendation to any other

-25-

RMC customer.

P's Opp at 5 (citing Van Dep (MSJ Ex 2) 89 to 90).  The court determines that Vandenberg's

inability to recall any other instance where he recommended continued use of a competitor's product

is potentially significant.  A reasonable factfinder could conclude that if it were truly an accepted

or common practice at RMC to recommend that customers keep using a competitor's product until

the paid-for supply ran out, Vandenberg would have been able to identify at least a single time

during his *twenty years* at Schaefer/RMC when he did so.  In other words, a factfinder could

conclude that Vandenberg had never recommended the continued use of a competitor's product

before, and only did so at the Michigan Air National Guard because he wished to undermine RMC

and help Enerco.

In fairness to Vandenberg, the factfinder could view this incident as completely innocent.

For example, a factfinder could conclude that Vandenberg *had* recommended such continued use

in the past, but simply could not remember those instances from over the course of a  long career

in which he served dozens, perhaps hundreds of customers.  Alternately, a factfinder could conclude

that Vandenberg had never recommended such continued use before the Michigan Air National

Guard incident in October 2005, but that he did so in that instance because he honestly believed that

the customer should not waste a product it had already paid for and that the recommendation was

not against RMC's policies or interests.  But the record merely permits, rather than compelling, these

exculpatory explanations for Vandenberg's recommendation that a customer use the product of the

very competitor to whom he later "jumped ship" after falling out with RMC.

Similarly, a reasonable factfinder could find that the reason Vandenberg did not consider

whether he had the authority to recommend the continued use of a competitor's product was because

he believed RMC implicitly authorized him to make such a recommendation, about a fairly small

amount of a competing product, without contacting management.  This view could appeal to a factfinder because Vandenberg had such extensive experience and knowledge in the business before the October 2005 recommendation, i.e., he reasonably expected that his employer would trust and defer to his judgment on such a minor matter.

Finally, a reasonable factfinder could find that the reason Vandenberg did not bother to research whether Enerco's product was really suitable for that customer's needs was because he already knew the Enerco product was suitable.  Alternately, the factfinder could find that Vandenberg did not know with confidence that the Enerco product was suitable, but his failure to check was the result of mere oversight.  On that view, Vandenberg would be perhaps careless, but not disloyal or malicious.  That would obviate the inference, urged by RMC, that the October 2005 recommendation was a harbinger of disloyalty and contractual breaches to come.  The factfinder would thus not conclude that the same alleged disloyal desire to harm RMC manifested itself after Vandenberg left, e.g., when he allegedly conveyed the wrongly-retained confidential material to Enerco.  Of course, the factfinder could instead conclude that Vandenberg was  recommending Enerco's product to the customer in deliberate disregard of whether it was suitable, simply as a small way of harming RMC and helping Enerco.  But the record does not compel either view, which is the very definition of a genuine issue of material fact.

Around the same time, October 2005, Enerco president and majority-owner Othmer called Vandenberg and inquired about an RMC customer.  As RMC puts it, "[w]ithout making any determination as to whether he was permitted to disclose the requested RMC product information to a direct competitor, Vandenberg provided the information to Othmer over the phone."  P's Opp at 6 (citing Van Dep (MSJ Ex 2) at 95 to 98).  At oral argument, RMC's counsel repeated the allegation that Vandenberg did not check whether RMC approved of his giving the product

information to a competitor, and Vandenberg's counsel did not contradict him.

On December 22, 2005, Vandenberg faxed Othmer a copy of his RMC employment contract. *See* P's Opp at 6-7 (citing Sealed Ex F). It is not clear whether RMC considers this to be a breach of the contractual duties of loyalty and/or nondisclosure. Rather, RMC appears to suggest that these two events, taken together, show that Vandenberg gave Enerco the product information in order to curry favor in the hope of receiving a job offer in the near future. The court determines that a reasonable factfinder could draw that inference. That would constitute additional circumstantial evidence in support of the breach-of-contract claim.

Second, the defendants essentially contend that no reasonable factfinder could find that they and/or Vandenberg used RMC's confidential pricing and customer information to solicit RMC customers. The defendants contend that RMC has no solid evidence on this point, whether documentary or otherwise, relying solely on speculation and the reasoning that the defendants "must have" improperly solicited the customers because "all of these customers were ready to jump as a soon as [Vandenberg] left" RMC. MSJ at 14, quoting RMC-Waidelich Dep (MSJ Ex 6) 58:11 to 59:1. RMC's interrogatory answers identify 66 to 68 accounts[8] that were serviced by Vandenberg, *see* MSJ Ex 11, of which Enerco says it now does business with 26 (eighteen "end users" and eight mechanical contractors). Enerco alleges that of the Vandenberg's 66-68 accounts at RMC, only five

---

[8]

Vandenberg testified that RMC double-counted one of his former accounts, listing both the Department of Veterans Affairs and the Veteran's Medical Center. *See* MSJ at 14 n.6. If that is correct, then RMC has identified 67, rather than 68, customers serviced by Vandenberg.

Vandenberg also testified that he did not recall ever servicing the account of the Vestaburg Schools, which were on RMC's list of his former accounts. *See* MSJ at 14 n.6, citing Van Dep 82:8-25. If that is correct, then RMC has identified 66 customers serviced by Vandenberg.

were "completely new customers of Enerco": Battle Creek Schools, the VA, Oakdale Christian Schools, Calhoun Area Career Center, and Pennfield Schools.  MSJ at 15-16, citing Ex 7 (Enerco Bates Nos. 1-45) and Ex 8 (Enerco Bates Nos. 363-783) and Docket No. 51.[9]

Of the eighteen end-users who switched from RMC to Enerco, thirteen have filed sworn statements that Vandenberg had no role in their decision to switch and that they initiated contact with Enerco or were already customers of Enerco.  *See* MSJ Ex 12.  Seven of those eighteen end users, representing 74% of dollar sales to alleged former RMC customers, have filed sworn statements that their switch to Enerco was motivated not by pricing but by dissatisfaction with RMC's services or products or from the desire to use only one vendor.  *Id.*  The defendants submit this information to try to show that Enerco did not much benefit from any alleged improper use of RMC's confidential pricing and customer information.  On a related tack, the defendants argue that "Enerco had no need or use for RMC's pricing information that Vandenberg allegedly brought with him to Enerco", because they were generally familiar with their competitors' pricing before they hired Vandenberg and had been able to compete on price effectively before his arrival.  *See* MSJ at 16-17.  Enerco also asserts that because its proposals to prospective new customers "cap any increases incurred . . . over [the customer's] prior year expenditures," MSJ at 21, it did not need access to whatever confidential pricing information Vandenberg possessed.  *See id.* ("In this way, Enerco is able to guarantee that its prices would not exceed those of its competitors by more than 10% without the need for a competitor's actual pricing schedules.").

---

[9]

The defendants also point out that Vandenberg does not service any of his former RMC accounts as an Enerco representative.  *See* MSJ at 16 (citing Ex 13 - Enerco Bates No. 217).  But even if that is true, it would not prevent a factfinder from finding that Vandenberg or Enerco acted unlawfully in getting those customers to switch from RMC to Enerco in the first place.

**The defendants' arguments on this score are of no avail to their summary-judgment motion.**  The defendants' own account leaves open the possibility that *some* of the customers who switched from RMC to Enerco did so at least in part because of lower price.  Moreover, the defendants' account permits, but does not *compel*, the conclusion that it would have been able to under-cut RMC on price with the switching customers even if it had no improper help from Vandenberg.  For one thing, assuming it was Enerco's uniform practice to guarantee in writing a price no more than 10% above the prospective customer's existing vendor, *see, e.g.,* MSJ Ex 8 (Kalamazoo Schools at Enerco Bates Nos. 398-99, Battle Creek Schools at 441-42, and Portage Schools at 528-29), it still seems that Enerco would not always know *exactly* what RMC was charging its customers unless Vandenberg told it.  In other words, nothing in Vandenberg's account precludes the finding that Vandenberg improperly provided confidential pricing information to Enerco which in fact enabled Enerco to win at least some price-sensitive business from RMC which it would not have won otherwise.

And Enerco does not deny that the documents and files wrongfully retained by Vandenberg after he left RMC contained not only confidential pricing information, but also other confidential product and customer information.  If Vandenberg indeed gave such information to RMC, there is a genuine issue as to whether that information played a role in Enerco luring away some of Vandenberg's former customers on grounds other than pure price.

**As to count two, the claim that Enerco tortiously interfered with RMC's business relationships**, under Michigan law RMC must show a genuine issue as to whether (1) there was a valid business relationship or expectancy of the same between Enerco and at least one switching customer (which relationship need not be predicated on an enforceable contract); (2) Enerco knew that Enerco and at least one such customer had such a business relationship or expectancy; (3)

Enerco intentionally interfered with the RMC-customer relationship by inducing or causing a breach or termination of the relationship; and (4) as a result, RMC suffered damage due to the disruption or termination of the business relationship. *Stromback v. New Line Cinema*, 384 F.3d 283, 206 (6th Cir. 2004) (citing *BPS Clinical Labs. v. Blue Cross & Blue Shield of Michigan*, 552 N.W.2d 919, 924 (Mich. App. 1996)).

"If the defendant's action were 'motivated by legitimate business reasons, its actions would not constitute improper motive or interference.'" *Partner & Partner, Inc. v. ExxonMobil Corp.*, – F. App'x –, –, 2009 WL 1184796, *4 (6th Cir. May 4, 2009) (<u>Guy</u>, Gilman, Cook) (citing *BPS Clinical Labs.*, 552 N.W.2d at 925). RMC must show a genuine issue as to whether Enerco intentionally did some act that was "*per se* wrongful" or did "a lawful act with malice and unjustified in law for the purpose of invading the . . . business relationship" RMC had with one of its customers. *Partner*, – F. App'x at –, 2009 WL 1184796 at *4 (quoting *Feldman v. Green*, 360 N.W.2d 881, 891 (Mich. App. 1984)).

Under Michigan common law, "a *per se* wrongful act is one that is 'inherently wrongful or an act that can never be justified under any circumstances.'" *Urban Assocs., Inc. v. Standex Electronics, Inc.*, 216 F. App'x 495, 514 (6th Cir. 2007) (Griffin, J.) (quoting *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 635 (Mich. App. 1992) (citing *Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 421 N.W.2d 289 (Mich. App. 1988))); *see also Wilson v. Continental Dev. Co.*, 112 F. Supp.2d 648, 665 (W.D. Mich. 1999) (Bell, J.), *judgment aff'd*, No. 99-2113, 234 F.3d 1271, 2000 WL 1679477 (6th Cir. Nov. 2, 2000) (p.c.) (Guy, Norris, E.D. Ky. D.J. Hood). RMC concedes, and the court assumes *arguendo*, that it was not *per se* wrongful for Enerco's president (Othmer) and sales manager (Cranson) to initiate contact with its competitor's customers, respond to inquiries from them, or otherwise aggressively woo them. Therefore, RMC must show that Enerco did those lawful acts

"with malice" and "without justification in the law" for the purpose of invading RMC's business relationships.

As discussed above, a reasonable factfinder could conclude that Vandenberg disclosed confidential RMC pricing and other information to Enerco to help it win his old customers, and that Enerco did successfully use that information to win at least several of those customers. In turn, because Enerco was aware of Vandenberg's nondisclosure/nonsolicitation agreement, one could infer it knew Vandenberg was breaching his agreement but intentionally profited from the use of information made available by the breach and Vandenberg's attendant disloyalty. In this scenario, RMC at a minimum knew about, acquiesced in, and benefitted from Vandenberg's disloyalty and breach of his contractual duties. Worse, a factfinder reasonably could surmise that Enerco encouraged Vandenberg's breach, or even required it as an unwritten condition of his getting and keeping the Enerco job. Whether Enerco required, encouraged, or merely acquiesced in Vandenberg's breach, its intentionally or knowingly exploiting and profiting from the breach (if the factfinder so found) would transform normal vigorous competition into a malicious, unethical act for which a tortious interference action will lie.[10]

---

[10]

Enerco complains, "There is absolutely no legal support for RMC's imputation of Vandenberg's Agreement onto Enerco. Enerco is not a party to the Agreement and cannot be bound by it's [sic] terms." Defs' Reply at 6; *see also id.* at 10 ("Enerco was not bound by [the] terms of the Agreement and was not legally obligated to refrain from competition with RMC.").

The court agrees with these statements as far as they go, but Enerco misses the wider point. The court must determine whether a factfinder could consider Enerco's wooing of Vandenberg's former RMC customers to be "malicious" or unethical – an element of tortious interference. Absent Michigan precedent to the contrary, this court certainly considers it malicious and unethical to intentionally profit from an employee's disloyalty and breach of his contractual obligations. The court does not hold that Enerco was directly bound by the Vandenberg-RMC contract.

Enerco counters with the "argument" that

-32-

Lastly, Enerco complains that RMC had no guarantee of keeping Vandenberg's former customers, such that any alleged interference could not have proximately caused legally actionable damages (the loss of the revenue from the customers who switched to Enerco). This argument is unavailing on this record, particularly at the summary judgment stage. RMC need only show a genuine issue as to whether it had a "reasonable likelihood" of retaining those customers which rose beyond "mere wishful thinking", and it has done so.

On Enerco's reasoning, unless a company had a contract absolutely obligating its customer to continue buying service and/or products from the company for a specified period of time, the company could never maintain an action for tortious interference with an existing business relationship or contract. The court has not located any Michigan precedent for such an extreme view. And Enerco has not presented any evidence to cast doubt on the premise that most of RMC's customers were not likely to leave RMC absent Enerco's efforts to persuade them to leave. While it is not possible to ascertain with precision the revenues that RMC likely would have derived from the customers had they not been convinced to switch to Enerco, that goes only to damages, not to

---

As Othmer noted in his deposition, Enerco was not privy to which customers Vandenberg serviced while employed at RMC. Othmer Dep., Tr. 38:20-23 (Ex. 3) (quoted above). In fact, Vandenberg was not permitted to disclose such confidential customer information by virtue of the Agreement. Enerco, therefore, *could not possibly* "intentionally" solicit Vandenberg's former RMC accounts.

Defs' Reply at 8. Enerco's argument on this score is circular and conclusory – and contrary to the summary-judgment standard which prevails in this court and in Michigan courts. Enerco again seems to proceed on the odd premise that the factfinder is obligated to accept the defendants' allegation that Vandenberg did not disclose confidential customer information to Enerco.

The opposite is true: because the defendants are moving for summary judgment and RMC has not cross-moved, the court is not permitted to assume the truth of Enerco's factual allegations where RMC has not admitted or failed to contest them. It is absurd to state that Enerco "could not possibly" have known the identity of Vandenberg's former customers; nothing in this record preclude a finding that Vandenberg directly *told* Enerco the identity of those customers.

-33-

the existence of a viable claim.  *Cf. Lucas v. Monroe Cty.*, 203 F.3d 964, 979 (6th Cir. 2000)

("Plaintiffs have presented evidence of a reasonable expectancy of an economic relationship with

stranded motorists who arranged for towing services via the call list maintained by the Sheriff's

Department.  * * *  While the amount of towing business plaintiff would have received if placed on

the call list cannot be specifically determined, this issue goes only to damages.").

In short, while RMC may not have presented overwhelming evidence to support its claims,

especially on count two, this court is obliged to view the record in the light most favorable to RMC

as the non-movant, and draw all reasonable inferences in its favor.  *See Amerisure Ins. Co. v. Plumb*,

– N.W.2d –, 282 Mich. App. 417, –, 2009 WL 330241, *2 (Mich. App. Feb. 10, 2009) (citing

*Houdek v. Centreville Twp.*, 741 N.W.2d 587, 592 (Mich. App. 2007) (affirming Cir. J. Philip E.

Rodgers, Jr.)); *accord Keck v. Graham Hotel Sys., Inc.*, – F.3d –, –, 2009 WL 1406402, *1 (6th Cir.

May 21, 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The court must also be mindful that under Michigan law, circumstantial evidence[11] alone can be

---

[11]

Both in their briefs and at oral argument, the defendants repeatedly charge that RMC's
claims rest on nothing more than conjecture and speculation.  The Michigan courts have carefully
distinguished between conjecture (illegitimate) and legitimate reliance on circumstantial evidence
for a potentially persuasive chain of reasoning.  "A conjecture is simply an explanation consistent
with known facts or conditions, but not deducible from them as a reasonable inference."  *Libralter
Plastics*, 502 N.W.2d at 744 (citing *Kaminski v. Grand Trunk W. R. Co.*, 79 N.W.2d 899, 901-902
(Mich. 1956)).  As the Michigan Supreme Court has explained,

There may be two or more plausible explanations as to how an event happened or
what produced it; yet, if the evidence is without selective application to any one of
them, they remain conjectures only.  On the other hand, if there is evidence which
points to any one theory of causation, indicating a logical sequence of cause and
effect, then there is a juridical basis for such a determination, notwithstanding the
existence of other plausible theories with or without support in the evidence.

*Kaminski*, 79 N.W.2d at 902.  Today's ruling means that a reasonable factfinder *could* take this
record to establish "a logical sequence of cause and effect" from Vandenberg's breach of alleged

-34-

enough, not only to survive summary judgment, but to prevail at trial.  *See Libralter Plastics, Inc. v. Chubb Group of Ins. Cos.*, 502 N.W.2d 742, 744 (Mich. App. 1993) (citing *Firemen's Ins. Co. v. Sterling Coal Co.*, 83 N.W.2d 319 (Mich. 1957)), *app. denied*, 514 N.W.2d 772 (Mich. 1994); *accord Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 765 (6th Cir. 2008) (applying Michigan law) ("the plaintiff may recover damages even based on circumstantial evidence alone") (citation omitted).[12]

In a context similar to ours, one federal court aptly remarked that plaintiffs in confidential-information or trade-secret cases,

> who must prove by a fair preponderance of the evidence disclosure to third parties and use of the trade secret [or confidential information] by the third parties, are confronted with an extraordinarily difficult task.  Misappropriation and misuse can rarely be proved by convincing direct evidence.  In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs alleged happened did in fact take place.  Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything.  This is such a case.[13]

_____

contract and Enerco's alleged tort, to the customers' decisions to switch from RMC to Enerco, to resultant economic damage to RMC.  Whether the factfinder *will* accept RMC's "plausible explanation" rather than the defendants', however, is a less certain matter.

[12]

Enerco asserts, "Although a court has discretion to consider circumstantial evidence, such evidence standing alone generally is not sufficient to establish a *prima facie* case."  Defs' Reply at 2.  Enerco, however, cites no authority for this proposition, under Michigan law or otherwise.  Moreover, even if there were Michigan precedent remarking that circumstantial evidence alone "generally" is not enough to survive summary judgment, that would have no bearing on whether or not RMC's circumstantial evidence is enough to survive summary judgment on *this* record.

[13]

Enerco complains that "Vandenberg's *uncontroverted* testimony is that he did not discuss with his former customers his intentions during the one-year following termination of his employment relationship with RMC."  Defs' Reply at 3 (emphasis added) (going on to quote Van Dep (Def Reply Ex 1) 122 and 125 to 126 and 131:1-10).  Enerco does not explain, however, why a factfinder would be legally obliged to credit Vandenberg's statement on this score.  If the factfinder found Vandenberg to be not credible – whether because of subjective factors such as his facial expression, body language, or tone of voice, compared to other witnesses, or because of some

-35-

*Greenberg v. Croydon Plastics Co., Inc.*, 378 F. Supp. 806, 814 (E.D. Pa. 1974); *cf. Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6ᵗʰ Cir. 2005) (Rogers, J.) (citing *Greenberg* and stating, "The parties have not referred to and we have not discovered any Tennessee cases considering whether parties may rely on circumstantial evidence to prove use of a trade secret. * * * *[A] strong argument could be made that courts may properly consider circumstantial evidence . . . . Other circuit courts have permitted such an inference in* trade-secret *and nondisclosure cases*.") (collecting published decisions from seven Circuit Courts).[14] Viewed through that prism, the record leaves genuine issues of material fact as to whether Vandenberg breached the contract and whether Enerco tortiously interfered with RMC's business relationships. Whatever RMC's chance of prevailing at trial, it has done enough to survive summary judgment. *Cf. Leary v. Daeschner*, 349 F.3d 888, 902 (6ᵗʰ Cir. 2003) ("Plaintiffs' evidence that their transfers were motivated by their protected speech, while not

---

perceived implausibility or inconsistency in his account of events – the factfinder would be free to find that Vandenberg *did* talk to his customers about switching to Enerco and is simply lying about it now. The same is true of Vandenberg's testimony that he never spoke to Enerco about them "actively soliciting" his former RMC customers and trying "to get that business away from Rochester Midland", *see* Defs' Reply at 5 (citing Reply Ex 1 at 122 and 126 to 127).

It is true that RMC has not produced direct evidence that Vandenberg improperly solicited customers to switch to Enerco, e.g., an affidavit or business record from a former RMC customer showing that Vandenberg solicited them either before he left RMC or within one year thereafter. But such evidence, while it could help RMC, is not legally required to survive summary judgment.

[14] Enerco asserts that *Greenberg* is "contrary to Sixth Circuit law", *see* Defs' Reply at 2-3. But Enerco fails to identify which Sixth Circuit decision it believes forecloses the application of *Greenberg*'s logical observation here. Moreover, this court is applying not "Sixth Circuit law" but *Michigan state law*. The only authoritative statements of Michigan law are decisions by the Michigan Supreme Court or published decisions by the Michigan Court of Appeals, not decisions by *any* federal court. This court is free to disregard even published Sixth Circuit Court of Appeals decisions interpreting Michigan law. Enerco does not identify Michigan precedent which suggests the Michigan Supreme Court would reject the sensible observation made in *Greenberg*. "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." *Rector v. GMC*, 963 F.2d 144, 146 (6ᵗʰ Cir. 1992).

-36-

overwhelming, is more than a scintilla and is sufficient to survive a motion for summary judgment.") (citation omitted).

## ORDER

Defendants' motion for summary judgment [document #55] is **DENIED**.

Because this is not a final order, *Ellis v. Kaye-Kibbey*, 581 F. Supp.2d 861, 884 (W.D. Mich. 2008) (Maloney, C.J.) (citing *Johnson v. UPS*, 117 F. App'x 444, 447 (6th Cir. 2004)), it is not immediately appealable. *See Griffin v. Reznick*, – F. Supp.2d –, 2008 WL 5110528, *10 (W.D. Mich. Dec. 2, 2008) (Maloney, C.J.) ("'Absent certification of an interlocutory appeal under 28 U.S.C. § 1292(b) or FED. R. CIV. P. 54(b), an order disposing of fewer than all parties or claims is nonappealable.'") (quoting *Bd. of Ed. of Avon Lake City v. Patrick M.*, 2000 WL 712500, *4 n.5 (6th Cir. May 24, 2000) (citing *Tanner Co. v. US*, 575 F.2d 101, 102 (6th Cir. 1978))). *See, e.g., Settembre v. F&G Life Ins. Co.*, 552 F.3d 438, 441-42 (6th Cir. 2009) (Kethledge, J.) (dismissing, for lack of jurisdiction, an appeal from district court's reversal of bankruptcy court's grant of SJ).

**IT IS SO ORDERED** on this   1st   day of June  2009.

/s/ Paul L. Maloney
Hon. Paul L. Maloney
Chief United States District Judge